UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-20065-CR-SEITZ/MCALILEY

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LEEBERT RAMCHARAN and
EVERETT DONOVAN WILLIAMS,

    Defendants.
_____/

## REPORT AND RECOMMENDATION
## ON MOTIONS TO SUPPRESS

Defendants Leebert Ramcharan and Everett Donovan Williams have filed motions to suppress evidence derived from electronic surveillance conducted by the Colombian National Police ("Colombian wires") and the Royal Bahamian Police ("Bahamian wires"). Specifically, both Ramcharan and Williams seek suppression of recorded conversations captured from the Colombian wires [DE 297, 298], and Ramcharan seeks suppression of recorded conversations captured from the Bahamian wires. [DE 296].[1]

On August 29, 2007, the Court heard oral argument on the question of standing, and on September 6, 2007, an evidentiary hearing was held on the merits of the motion to

---

[1] The Honorable Patricia A. Seitz referred the motions to this Magistrate Judge for report and recommendation. [DE 301].

suppress the Bahamian wires.[2] For the reasons given below, this Court recommends that the motions be denied.

1.    **Procedural background**

Defendants Ramcharan and Williams, along with a number of other individuals, stand charged by indictment with three cocaine-related crimes: conspiracy to import, conspiracy to possess with the intent to distribute, and attempted importation. [DE 3]. Ramcharan and Williams, both of whom are Jamaican nationals, were the subject of proceedings in Jamaica, which resulted in their extradition to this country on March 20, 2007. [*See* DE 226, 227]. Both Defendants are scheduled for trial on November 26, 2007. [DE 325].

2.    **Defendants do not have standing to challenge the Colombian wires**

The Colombian wires, which operated from January, 2003 through March, 2004, involved the electronic surveillance of various Colombians' telephones. None of the intercepted telephones belonged to Ramcharan or Williams, and neither man was among the persons intercepted by that electronic surveillance. The Colombian wires did record the conversations of various individuals who the government contends were participating in the conspiracies Ramcharan and Williams stand accused of, and the government intends to move some of these recordings into evidence at trial. By their motions, Ramcharan and Williams seek to preclude the introduction of this evidence, claiming that the Colombian government's

---

[2] The government filed a memorandum that addressed the issue of standing [DE 307], and one that addressed the merits of the motion to suppress the Bahamian wires [DE 316]. After the evidentiary hearing the government filed supplemental authority in support of its position regarding the Bahamian wires. [DE 326].

eavesdropping violated their Fourth Amendment rights.

It has long been recognized that the electronic recording of a person's conversations is a search and seizure withing the meaning of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 353 (1967). It is also well-established that Fourth Amendment rights are personal rights, and may not be vicariously asserted. *Alderman v. United States*, 394 U.S. 165, 174 (1969). Therefore, to prevail, a defendant seeking to suppress evidence derived from electronic surveillance (like a defendant who seeks to suppress other forms of evidence) must establish that his own Fourth Amendment rights were violated by the challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 132 n.1, 133-134 (1978).[3]

The Supreme Court, in *Alderman v. United States*, 394 U.S. 165 (1969), rejected the notion that a defendant whose voice was not intercepted and whose telephone was not wiretapped could move to suppress electronic surveillance:

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

394 U.S. at 171. The Court concluded that an unconstitutional electronic surveillance violates the Fourth Amendment rights of persons whose conversations were overheard, or

---

[3] Whether a criminal defendant is permitted to challenge an alleged unconstitutional search or seizure has for many years has been referred to as a question of standing. *See Rakas*, 439 U.S. at 133. In *Rakas*, the Supreme Court departed from the terminology of "standing," explaining that the issue is more precisely identified as "the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Id.*

3

whose premises were subject to the surveillance, but not codefendants against whom the evidence might be introduced. 394 U.S. at 176.

Defendant Williams attempts to distinguish *Alderman* with his argument that, apparently unlike the proponents of suppression in *Alderman*, Williams' name was specifically mentioned in at least one of the intercepted telephone conversations. Williams argues that the introduction into evidence of these tape recordings of alleged co-conspirators speaking about him will cause him greater injury, and therefore he should be able to challenge those interceptions.

Williams' argument does not hold up. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143 and citing *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980)). No one has a legitimate expectation of privacy that he or she will not be spoken about by others. More specifically, Ramcharan and Williams had no legitimate expectation of privacy that they would not be discussed by their alleged coconspirators talking on their own telephones.

Ramcharan and Williams were obliged to allege facts in their motions that, if proven, would establish their legitimate expectations of privacy in the premises searched or in the property (here, voices) seized. *See United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985); *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984). Neither defendant

4

met this obligation. Therefore, there is no basis for this Court to conduct an evidentiary hearing on these motions. *Richardson*, 764 F.2d at 1527; *Sneed*, 732 F.2d at 888.

For these reasons, Defendant Ramcharan's and Williams' motions to suppress evidence taken from the Colombian wires should be denied.

3.   **The Bahamian wires**

Defendant Ramcharan also seeks suppression of the Bahamian wires. He was one of the callers intercepted on those wires; therefore there is no question that he is someone whose Fourth Amendment rights may have been infringed by the electronic surveillance.

In his motion Ramcharan contends that the Bahamian authorities conducted their wiretap at the request of the DEA as part of a coordinated U.S., Colombian and Bahamian criminal investigation into narcotics trafficking between persons in those three countries and Jamaica. [*See* DE 296, p. 2, ¶ 3]. According to Ramcharan, the Colombian government conducted a wiretap parallel to the Bahamian wires, which Ramcharan surmises was done at the request of the DEA. He also believes that "the DEA . . . requested [the Bahamian wiretap]. . . based upon information from the Colombian wiretap interceptions suggesting that some of the drugs sent to Jamaica were being smuggled into the United States via the Bahamas." [*Id.* p. 3, ¶ 3]. Ramcharan argues that the Bahamian wires did not meet the requirements of U.S. law and therefore the government should not be able to use recordings made from those wires against the Defendants.

The evidence introduced at the evidentiary hearing does not support Ramcharan's

factual assertions. And, as is explained below, the applicable law does not support the Defendant's bid for suppression of the Bahamian tape recordings.

### a. Findings of fact

Two witnesses testified at the evidentiary hearing: Constable Brian Rolle, of the Royal Bahamian Police Force (RBPF), Drug Enforcement Unit, and Special Agent Robert McKnight, of the U. S. Drug Enforcement Administration.[4]

Constable Rolle was the RBPF officer responsible for the Bahamian wires. [Tr. p. 39, 42, 62]. Rolle is a 20-year veteran of the RBPF who has been assigned to the monitoring unit of the intelligence section of the Drug Enforcement Unit since 1998. [Tr. p. 8-10]. The monitoring unit conducts electronic surveillance of suspected drug traffickers in the Bahamas. [Tr. p. 8-9, 12].[5]

Beginning on March 9, 2003, and continuing until June 14, 2003, the RBPF electronically monitored several telephones of Oscar Pinder, a Bahamian national living on the island of Abaco, who was under investigation for narcotics trafficking. [Tr. p. 33-37; Gov. Ex. 2]. Rolle explained that the decision to listen to Pinder's telephones came about in January 2003, when the RBPF gained the technical ability to electronically monitor

---

[4] The transcript of the evidentiary hearing has been filed with the Court [DE 340], and is cited here as "Tr. p. ___."

[5] At the time of the 2003 electronic interceptions, Rolle had the rank of Corporal. [Tr. p. 10]. In May of this year he was promoted to the rank of Inspector, and he supervises at least seven officers working in the monitoring unit. [Tr. p. 9-10]. Rolle reports to the Commander of the Drug Enforcement Unit, who in turn reports to the Commissioner of Police, who is appointed to that position by the Prime Minister. [Tr. p. 12, 44].

cellular telephones. Before that time, the RBPF could only monitor "hard lines." In January 2003, Drug Enforcement Unit officers reviewed their intelligence files to identify suspected Bahamian narcotics traffickers using cell phones, who might be appropriate targets for electronic monitoring. [Tr. p. 36-38, 47-48]. Pinder, a "major target" of the Drug Enforcement Unit, was one such person. [Tr. p. 39]. For years the Drug Enforcement Unit had been collecting information about Pinder's alleged narcotics trafficking, and the Unit commander, together with the supervisors in the monitoring room, decided to seek authorization to intercept his telephones. [Tr. p. 37-38, 47-48, 58-59, 62-65].

Electronic monitoring in the Bahamas is governed by the Listening Devices Act [Tr. p. 14-15; Gov. Ex. 1], and Rolle credibly testified that the interceptions of Pinder's telephones were conducted in compliance with the Act. [Tr. p. 96].[6] Section 5 of the Act provides that the Commissioner of Police, after consultation with the Attorney General, may authorize electronic monitoring for a period not to exceed 14 days, when the Commissioner is satisfied that an offense has been committed or is reasonably likely to be committed, and where use of a listening device is necessary to obtain evidence of the offense. [Ex. 1, ¶ (5)(2); Tr. p. 16-20].

---

[6] The Listening Devices Act is codified in Chapter 90 of the Bahamian code, and the government introduced into evidence a copy of the Act. [Gov. Ex. 1]. When compared to this country's wiretap law (Title III of the Omnibus Crime Control and Safe Streets Act, Title 18 U.S.C. §§ 2510-2520), the Bahamian statute is relatively simple, and places few requirements on the government. For example, the Listening Devices Act does not require the Bahamian government to first exhaust less intrusive investigative means before seeking authorization to conduct a wiretap, and it does not require the "live" monitoring of calls or the contemporaneous minimization of irrelevant calls. [Gov. Ex. 1; Tr. p. 29-31].

Rolle prepared the first application to monitor Pinder's telephones, relying upon information in the Drug Enforcement Unit intelligence files that indicated Pinder had in the past engaged in narcotics trafficking, and likely was continuing to do so. [Tr. p. 13-14, 35, 62-65]. The commander of the Drug Enforcement Unit submitted seven subsequent requests to continue the monitoring for 14-day periods.[7] The Commissioner of Police (and, at times, the Acting Commissioner of Police), authorized this eavesdropping with eight consecutive written authorizations, each for 14 days of electronic monitoring. [Tr. p. 93-95; Gov. Ex. 2]. Rolle was the lead monitor of Pinder's telephones and was assisted by other RBPF officers. [Tr. p. 35, 62].

Rolle emphatically and credibly testified that the decision to eavesdrop on Pinder's telephones was made solely by the RBPF; it did not consult the DEA about the decision, nor did the RBPF act at the DEA's request. [Tr. p. 38-39, 48-50]. Similarly, Rolle testified that the Bahamian investigation of Pinder was not done in concert with Colombian law enforcement authorities, the RBPF did not rely upon any information from Colombian authorities to undertake the Pinder wiretap, and the RBPF did not share with Colombian law enforcement any information gained from the Bahamian wiretaps. [Tr. p. 42-43].

Rolle was also clear that the RBPF first learned about Defendant Ramcharan when

---

[7] Apparently, once authorization was given for interception of particular telephone numbers, follow-up requests to intercept for additional 14-days periods were made by the Commander of the Drug Enforcement Unit to the Commissioner of Police, without Rolle having to complete a new application. [See discussion Tr. p. 65-71]. Subsequent applications could rely upon information given in previous applications. [Tr. p. 100].

he was intercepted on the Pinder wiretap; the RBPF was not aware of a U.S. investigation of Ramcharan while it monitored Pinder's telephones. [Tr. p. 60-61]. Furthermore, when Ramcheran was intercepted on the Pinder wire, the RBPF did not conduct a follow-up investigation of Ramcharan, other than to notify Jamaican authorities that Ramcharan had been intercepted speaking to Pinder about apparent narcotics trafficking. [Tr. p. 58, 60-61].

Rolle testified about the cooperative working relationship between the RBPF and U.S. law enforcement interests in the Bahamas. The two countries share information of mutual interest. [Tr. p. 74]. DEA agents are stationed in the Bahamas and have access to U.S. Coast Guard and Army helicopters, and can make them available to the RBPF to fly over and observe homes, boats, etc. As part of the agreement between the two countries, a DEA agent must be on the helicopter during these fly-overs, but the RBPF decides the subject of the aerial surveillance. The DEA's role is one of assisting the RBPF in its investigations, and all investigations must be conducted according to Bahamian law. [Tr. p. 50-53, 72].

Rolle testified that on at least several occasions RBPF officers flew in U.S. helicopters as part of the Pinder investigation [Tr. p. 55], but they did not use any other United States assets to investigate Pinder. [Tr. p. 58].

Rolle also described some of the RBPF's security procedures for electronic monitoring. All monitoring takes place in one room – the monitoring room – located on the second floor of the Drug Enforcement Unit, in a building owned by the Royal Bahamian Police. Access to the room is controlled by key cards, which are issued only to RBPF